Good afternoon and may it please the court. My name is Matthew Robinson on behalf of the appellant Mark Randall Jones. Mr. Jones stands convicted of conspiracy to distribute five kilograms of cocaine and possession with intent to distribute 500 grams or more of cocaine. He now asks this court to reverse his convictions and 30-year sentence based on violations of the Fourth Amendment, violations of his rights to due process and a fair trial, and his right to confrontation. Jones also submits that there is insufficient evidence that was presented in the district court to sustain a conviction for conspiracy in particular. I know the brief is very long and I thank you at this court for reading it, but Mr. Jones has his life on the line and there are significant issues in this case. The first being is the seizure of the two packages of mail from a post office in California. And the facts surrounding the seizure are all provided by one, by the testimony of one officer, Officer Jaworski or Agent Jaworski. He was an independent contractor for the Postal Inspection Service. He, the facts are he saw a black male walk into the post office holding a carrying box with two boxes inside of them. I'm probably all familiar with those facts and I haven't cut you off on property for that. What do you make of the Van Leeuwen case? It is dated. It basically says there the postal worker, I don't know if they were called an inspector, notified a policeman who happened to be there. That's at least what the opinion says. And the policeman did, excuse me, at least as much as was done here by this inspector. And Douglas says, towards the end of the opinion, there's no Fourth Amendment aspect, that's not a direct quote, but you probably know what the direct quote is, to what happened there. Why is moving the package enough to look at the address and return address and whatever else he did? Why is that a Fourth Amendment issue? Well, why isn't Van Leeuwen pretty close to this? Well, first of all, it's a — And if you want to pronounce it a better way, it's probably not saying it right. If — I think I can answer this question. I understand the — your question involves was the — were the packages seized the moment he pulled them from the mail chute. And even though it was a very brief detention, as the government would characterize it, it's still a seizure under the Fourth Amendment. It's a warrantless seizure. I think the difference is, is whether or not the warrantless seizure was justified. Well, wait a minute. This is where I kind of come off the rails here. Okay. It's — the Supreme Court, it seems to me, clearly said, you can take all the time you need to, to pick up and weigh a package, look how it's wrapped, look at the address. I don't understand why picking it up, carrying it over to show it to somebody else, holding it for six hours while you call, check on the return address, that's all a seizure under your theory. And the Supreme Court did not consider that a seizure. Well, in going back to Reed v. Georgia and some other cases where similar things have had, you have — there has to be a — How does a postal inspector inspect a package on the outside of it, the weight of it, the address, the return address, without picking it up and looking at it? Well, I — You're saying the only way you can ever look at the outside is you can't pick it up, I guess, to weigh it? The difference is they pulled it from the mail chute. What if they pulled it out of a mail bag? They decided, you know, we're going to go through every package today in the mail chute. Well, I would — Out of a bag, behind the counter. What difference does it make? Well, I understand your point, Your Honor, but I would still — I cannot concede that this is not a seizure under the Fourth Amendment, because he walked into the — he's standing in the post office waiting for something to happen, and he simply sees someone walk in, place a box in the mail chute — place two boxes in the mail chute, and that was what — something about it, a gut feeling, a hunch, is what his testimony was. He went over and picked it out of the mail chute, and then he seized it at that point. There's no doubt. You're finding that so much, but my concern is how do you distinguish the case that we're talking about that Judge Owen referred to, as well as different about that Douglas doesn't say reasonable suspicion, but he does at some stage say the only thing suspicious, or he uses the word somewhere in the text. Are you saying that's a reasonable suspicion case and this one isn't, or just tell us how you distinguish it? I'm saying there's no reasonable suspicion whatsoever for him to pull the packages at all. And so what about the precedent? You have an expectation of privacy in your mail that you're delivering. You cannot — I would — I think what happened here, and I'm having trouble distinguishing it, too, Your Honor, frankly, but in this instance, there is an individual monitoring the mail, and this individual sees someone that is — I hope to God somebody is monitoring our mail. Absolutely. But it's also — he took it from the stream of the mail. And I understand it was a brief detention. All he had was a black man put it in the mail, and that's it. There's nothing funny about the addressee or the return address. I agree with you. You know, that would be an easy question, but that's not what we have here. Well, and I'll go on to your next point, Your Honor, because I think even if that wasn't an initial seizure, the labels themselves were the only articulable basis for him to actually seize them further and later conduct a dog sniff. And those labels, yes, they were at different addresses. There was a — you were mailing a package from California with a Mississippi return address. However, there are other cases that also talk about the fact that this is not — you have a reasonable expectation in privacy, and it's not inherently suspicious for you to place fictitious names or labels. Well, in the case of the — the Supreme Court case, on the face of it, there was nothing suspicious. But upon investigation, they found out — I think it was the return address — was an abandoned dorm in a nearby college. I mean, and that was fine to follow up on that. It was not — you wouldn't have known that unless you did a little investigation. I'm sorry for talking over you. That's all right. The — you know, I think the issue here is with the — maybe reasonable suspicion was ultimately justified or found, especially after the dog sniff occurred, especially after they went and checked the addresses. And I agree with you. At some point, reasonable suspicion existed. But that entire time, they had the packages. They had seized the packages. They had mailed them to Inspector Kaye in Mississippi, and the investigation was happening on a separate level through Jaworski in California. And those things — yes, there simply is just not a reasonable suspicion based upon at the moment those packages were seized. At some point, this constitutes a seizure. You know, you can't — I don't understand how it can be argued that it's not a seizure when the boxes are out of the mail for a couple days or a day or two. And here, we're not even sure because the timeline is completely upside down or — or I should say faulty in terms of when the — when the packages were opened, when they arrived. Sotomayor, what's your best case for when the seizure occurred? Are you saying it's when there was a meaningful interference? Yes. And that's absolutely correct. I would say the Reid v. Georgia case, United States v. Morin, United States v. Glass. Meaningful interference with the — okay, but that wouldn't sound like it's the taking it out of the chute. Well, and that's the first part of my argument, yes, Your Honor. And I believe that when you — the Reid case talks about the fact that if you pull something from the mail, you have to have a reasonable suspicion to do that. I understand we're in a time when there's lots of reasons to inspect the mail. But there's still — we have to weigh that with the — with the ability to at least sustain the Fourth Amendment in someone's expectation of privacy with the mail that they're — they're sending. You know, click and ship labels, labels with different names, fictitious names on them. That may be inherently suspicious after you realize that there's probably cocaine in this box or reasonably suspicious if there's other factors combined with that. But there aren't any other factors of this initial seizure. Just because time's ticking, you added a bunch of other arguments. Yes. What I'd love to hear you explain a little further is what is your argument as to a constructive amendment and the 404b, intrinsic-extrinsic? Yeah. They — those arguments kind of go together, I think. And I think, first of all, we would argue that the — and this was argued at length at pretrial and post-trial level. And I — before I even answer this question, I want to say the judge in this case did not rule on the admission of the California evidence or the Lafer evidence as to why it was being admitted until post-trial motions were being ruled upon. And with this — when — in this particular instance, we have extrinsic — clearly extrinsic information or evidence coming from California of a separate investigation. We have extrinsic — At the jury charge conference, when you say you want the law abiding citizen instruction, did you say to the judge, I need a decision on 404b, I want a 404b instruction? I — that did not occur in the district court. I was not counsel below. But that's not part of the record, no. It was all made during pretrial and post-trial. What confuses me is you say in the reply brief the court failed to instruct the jury or the judge that it was admitted under 404b. That's correct. And yet a 404b instruction was given. That's correct. And at which — an instruction was given, at which the point of that argument is what evidence did that apply to? The jury or the parties — You're saying it didn't apply to the California evidence. It came in intrinsically. And the issue before us is to decide is it intrinsic or extrinsic? Is that your argument? No, it's not. My — my argument is that during the entire course of the proceedings, none of these pretrial rulings with respect to the 404b evidence were ruled upon until after trial was over. So where is the reversible error? Is it the failure to rule on your — That's part of it. Well, okay. Part of it. Go ahead. Because these are all separate arguments that kind of — it tells a full story. Because when you go — to answer this question, I would first say there were several pretrial motions filed. The judge decided to defer those pretrial rulings. The error in making that decision — But you get a 404b instruction. Yes, but without understanding what evidence was being admitted under 404b. But you didn't ask for it in the jury charge conference. You didn't ask the Court to particularize this applies to this. I understand that that may — that may be a fault in the district court in terms of how the arguments were presented at that time. However, reviewing the record as a whole, it's very — especially when you see the second pretrial motion that — or post-trial motion that was filed, motion for judgment of acquittal, that was filed well after the verdict came in and after the Rule 3033 time period. Because counsel realized for the first time — Could you tell me where in the record you made an objection to the Court's failure to rule on the 404b? Where is it that you object? The continuing objection starts at the beginning of the case. Where did you object on the issue that the Court had to make this finding? There is no objection at that point. So we'd be reviewing that first issue described for plain error. Yeah. Well, I would say that — I wouldn't say that, because, first of all, the argument is being raised at the pretrial level. It's being raised — the continuing objection was levied at — before the trial even started, and then it's raised again at the fact trial. Your underlying post-trial contention is that California is different than Mississippi, correct? That the California drug happenings are not connected. They're clearly extrinsic from — because the judge found them to be extrinsic in his post-trial ruling. My question is, did you ask for a multiple conspiracy instruction? There was not a request for that on the record. I cannot determine that from reviewing the record. And that's — that's just the simple truth. There's not a jury instructions — if there were jury instructions that were talked about prior to deliberations. What I'm struggling with is, I do think there's some chaos and — and arguably prejudice relating to the extrinsic — extrinsic-intrinsic. I'm trying to find — ask you where you see reversible error. Was it that the Court didn't rule enough? Did you preserve that? Was it a jury instruction request that you asked multiple conspiracy? It didn't give it? Where was the legal error? Reversible error with the 404b evidence in particular is — is proven through the constructive amendment to the indictment. The California evidence was not charged in the indictment, although the language that — that covers all other places was included in the indictment. But the — Well, so again — It was outside the scope. But you got to — you can't move on to another argument. When you say it wasn't charged, they said, and elsewhere, and you didn't move for a bill of particulars. Why didn't that — why doesn't that comprehend the beginning and ending of the whole drug trafficking? You're informed. You can ask for more details. This may be the case. However, I'm dealing with the record that I have. Okay. So in — in reviewing it, however, the — a constructive amendment happened as a result of the omission of the 404b evidence because all the evidence from California — and I see my time is almost up — all the evidence from the California post office, the cocaine and agent stills notes with respect to that drug transaction, that's all destroyed. It's all gone. So I see my time's up. I'll concede the rest for rebuttal. Thank you, Your Honors. May it please the Court. I'm Greg Kennedy, and I represent the United States of America. I'd also briefly like to introduce with me the trial counsel in the district court below, Ms. Erin Chalk and Ms. Keisha Middleton. Also, we have a distinguished guest with us today, the United States attorney for the is with us today as well. In addressing the Court's concerns about this mail inspection, I think the Van Llewellyn Court is exactly comporting with what common sense would dictate. When an individual places a piece of parcel in that stream of commerce, it travels by plane, rail, interstate commerce, and there is a duty to inspect and find out what's going on with these packages. But the Fourth Amendment applies. When you put something in the mail, you have an expectation of privacy as to the contents and its delivery. I thought the Supreme Court said, and then we reiterated in our Daniel decision, that the government can't meaningfully interfere with its delivery. And in this case, there was no meaningful interference, because if you'll notice, the mail was posted as priority mail, which, based upon the testimony, would give approximately four to five days from the time to transit from California to Mississippi. But a criminal investigator taking mail out of a chute based on gut or the appearance of the sender, how does that pass what we said in Daniel? You know, I'd particularly like you to focus on the Daniel decision and our suggestion that you need reasonable suspicion to take mail out of the normal flow. So if a criminal investigator takes something out of the flow, why doesn't he have to have reasonable suspicion to do that? He does have to have reasonable suspicion. There is no – well, in saying that, again, first part, there's no meaningful interference if we talk about the timeline involved, because it was express mail the next day. Now, for him to take it out of the chute and look at it, he needs reasonable suspicion. What he did in this particular case is, is that when he saw the boxes being distributed in the mail, what was not mentioned is the fact that this individual had over 30 years of experience as a postal inspector, over 20 of which working narcotics investigations, and having worked over 5,000 to 6,000 cases dealing with narcotics. I'm going to ask you to pause, because I think it makes it a problem case for you. I mean, my memory of the facts here is it's hard to say he had reasonable suspicion to take it out of the chute, unless we just say 30 years' experience means that gut is reasonable suspicion. I would think you would have to say Van Leeuwen allows anyone connected to the post office to turn a box upside down to look at an address. There is no suspicion at all that is needed. But don't just agree with me, because a second ago you said he needed reasonable suspicion. And I don't mean to confuse it in the sense that once it turns into a seizure, at the time he takes the box and looks at it, to turn it over and look at, reasonable suspicion is not required. All he's doing is inspecting it. And that's consistent with Daniel? Correct. It's to look at the outside. He's not doing anything other than a normal postal person would have done had they not used click-and-ship labels and taken it to a teller who would have then looked at it, weighed it, made sure it had the correct amount of postage. Dog alert gives you PC to go in it, right? Down the road, it does. All the irregularities, once he's looked at it and they've sent it on, there's no reasonable suspicion to detain it and bring the dog. The real difficulty for me in this case is, with our Daniel decision, can a criminal investigator take someone's mail and study it, whereupon they get reasonable suspicion? And to your point there, that's why it's all about the timing. What did he do at a specific point? Removing it from the mail chute itself does not require reasonable suspicion. The reasonable suspicion occurs when he looks at it. What did he observe? Click-and-ship labels. Okay. There's already been testimony that said click-and-ship labels will allow any individual to come up with a fictitious name or corporation, upload funds, pay for postage, all so that you don't even have to go to a teller. So it helps. Kennedy, what you're on now, I think, is a matter that very much is in your favor. The problem with this case that Judge Higginson and we've all been talking about is that initial stop. Not what he's — not the suspicion that arises once he looks at the box. What can he do to be able to look at the box efficiently to create that suspicion? And it seems to me Van Leeuwen, dated, not using the terminology perhaps I'd be using today, seems to support what's going on. More recent case law that looks at meaningful interference. What you're suggesting to us is that we need to draw some sort of line of time or degree of interference, all maybe tied up in the word meaningful, and decide that at least what was done here was not meaningful. But it seems to me that that's — that's the old slope that sometimes gets slippery of just how much involvement can somebody, without any suspicion, and with respect, I think, at least for now, the best way I look at these facts, there's no suspicion. There's a hunch. And maybe something behind the hunch that's not in the record, but there's no suspicion of — that would be recognized on the Constitution, I think. And so at least what is your best explanation for why a suspicionless looking at this package, taking control of it ever so briefly by this individual, why is that not a Fourth Amendment question? How else will they deliver the mail? Someone — He's not a delivery person. That's the problem. He's a law enforcement person for law enforcement purposes. There's a lot of handling of this thereafter, which is unrelated to law enforcement in the Fourth Amendment. But we're at the Fourth Amendment look, looking at it through the Fourth Amendment lens. Isn't that the key? I mean, would your — the logic of your position mean that if a sheriff walks in and says, I want to look at this, too, and customs officials walk in, I want to look at it, too, just temporarily, I'm going to take it out of chute, none of them are covered by the Fourth Amendment? Or is it critical that he's a postal employee, so therefore he's part of the delivery, even if he's a criminal investigator? See my question? I do, sir. OK. And if not necessarily part of the delivery, he's part of the overall system, where there is the intake of mail. From the time someone comes into that post office till the time they actually distribute that mail, OK, it then becomes in the charge of the post office to get it to the right place. Customs official who said, I want to take it out of the chute, they'd have to have reasonable suspicion? They should not have to have reasonable suspicion. They wouldn't either. Under Van Llewellyn and stuff, they should be able to look at that package. I mean, even in today's time, when we look at packages the way they're done, the post office — Should be able to. OK. Yeah. Because when it's traveling — Helps the society safe-wise, but I'm just not sure if that's consistent with a reasonable expectation of privacy. It's — the best example of it is when it's on the line and going through, they're able to observe it. Someone's going to be there to look at that mail. And obviously, there are random checks periodically as the mail goes through, looking for any oddities or profiles that might fit a drug profile, terrorist profile, or what have you. Surprisingly, there isn't circuit law on this. There isn't much. I mean, Daniel — Daniel, the phrase normal flow, you need reasonable suspicion to interrupt the normal flow. It would seem to me letting criminal, state, federal, other agencies stop something, that would not be consistent with our Daniel decision. But I don't know what the absence of circuit law means here. Maybe people do just look at it all the time, whatever their purpose. And again, too, in a situation like that, you have a reasonable expectation of privacy. There's no doubt. And when you put it in there, in this particular case, too, we have to consider the fact that his name was not listed as the sender or the recipient. Where's his standing to even be here to challenge this to begin with? Is there a case that you can have a dog sniffer in a post office to sniff every package? I don't have a case on that that says that. Not with me right now. Because we weren't really focused on that. But I do know that as a matter of practice, they rely on circuit authority, and I haven't seen it in ours, where that's exactly what they would do. They do random checks of the mail with canines to make sure that's not happening. The world of random checks is very different than a targeted one. Right. I would agree with that as well. But in this particular case, when he targeted that deal, he went outside and he looked and he saw the California license plate when he momentarily looks at the label just to see. Does it confirm his suspicion based upon his training and saw the discrepancies? Then I guess at that point, surely it moved into a seizure when he contacted Mississippi and then express mailed or overnighted it to get there to then do the drug dog sniff, which then led to probable cause for the search warrant. But that package and any privacy expectations would not have been breached until they failed to have probable cause or once that package was actually opened. And that's what they did in this case. You saw, you heard my confusion about extrinsic-intrinsic. Right. Okay. So jumping, if you don't mind jumping with me, it seems to me, but disagree if you do, that the government, at least in closing, argues unequivocally the California evidence comes in and you can use it intrinsically. That was the government's position from the very beginning. During trial, they told the district court judge that this search warrant in California is intrinsic. The government argued that always. But the district court at the Rule 29 stage in the new trial denial said I only admitted it for 404B. He did. He said also, if you look back at the record, he said, I think I agree with you, government, that it would be intrinsic, but out of an abundance of caution, I'm going to allow this in as 404B to show knowledge, intent, or for any other purpose under 404B. But the government's position was that it was always intrinsic because it's not 404B. This is not a case where they were trying to prove up prior bad acts, which is classic 404B, like a prior bad act. But what do we do with the new trial denial that district court said, I only admitted it for 404B? Well, he gave a 404B limiting instruction. So then it would be safe. However, your attorney in closing told the jury they could use it for guilt in the case in chief. Well, if they did, they could use it for purposes of showing intent. But that's not what they said in closing, right? Unless I missed that, I did not see them saying it. The search in California recovered 10 bottles of what was later determined to be cocaine. All in all, cocaine in excess of 5 kilograms was recovered as to count 1. Cocaine in excess of 500 kilograms counted as to count 2. All in all, that means, jury, you can consider all the California stuff in getting to the charged amount we gave. And yet the district court said, absolutely not. I only had admitted this for 404B. In this particular case, this court can affirm on anything supported by the record and show that the district court, this was actually intrinsic evidence. And it was the jury. But how would we know there was jury unanimity? We presume the jury follows the instruction. The jury's told 404B. That's right. That's a problem, right? Isn't it? That is Fifth Circuit precedent, that we presume that the jury will follow the instructions that are given. But also what the district court gives an instruction, you can't consider it for the case in chief. Government argues to them, you can consider it. How can we affirm a conviction in that situation? In this particular case, the defendant took the stand on his own and gave substantive testimony above 404B evidence. What he said on the stand. Harmless because of. Correct. Because when he started giving evidence, then it was not subject to a 404B analysis. It became substantive. And he was specifically asked about whether he knew about those packages. He specifically disclaimed any knowledge. He was asked if he knew anything about the drugs. He disclaimed any knowledge. He was asked if he was a drug dealer. And his response was, I've never been convicted in any state court in these United States. So the jury heard evidence and judged his credibility and determined what he was saying was totally false. So his denial that those drugs were attributable to him or part of that single conspiracy, they could take that as substantive evidence outside of what the court ruled 404B. I mean, the government can't just in its head think, well, this district judge is wrong. I know they're admitting it only for 404B, but I know it's intrinsic. I do not believe that the prosecutors would argue in contradiction to the court. It may appear to be that on the record. And again, just looking from the Cole record, it might look that way. But I don't think they would intentionally say, this is intrinsic. We're just going to plow right through this. No, I don't agree with that at all. But in the heat of making a closing statement, it might have gotten close to that point. But again, in the totality and the whole of the trial, all of the evidence that came in, at most it would be a harmless error situation. Because as this court had found when they looked at it, this individual was responsible for a vast cocaine trafficking network with a lavish lifestyle, with stretched limousines, no real way to report his income, was uncooperative, and the court had no problem finding that there was nothing underfoot in this particular case about trying to shade the evidence or do anything else to make sure that this individual was convicted on anything that was wrong. You touched on standing quickly, but in the reply brief, they say you didn't preserve that below and there's Fifth Circuit law that you can't argue that. What's your thought on that? Not exactly right. At ROA 136, the record on appeal, is where they filed their motion to suppress. And within that motion to suppress, they stated that they were taking the position for purposes of that motion only that he had standing, but did specifically say, quote, they intend to vigorously dispute at trial, close quote, that the packages were attributable to him. The government then, in its response at record on appeal 223, said the government  wasn't conceding it, but for purposes of that motion at that particular point in time. His Fifth Amendment right was protected at that point because he was allowed to challenge the Fourth Amendment without having to affirmatively state on the record what his position for standing was. But when he chose to waive that Fifth Amendment right, take the stand in his own defense at trial, that issue then took itself off the table. And when he waived that Fifth Amendment right, he specifically said, I wasn't even at the post office. It was June 4th, so I know I was on vacation because it was a holiday, and disclaimed any knowledge of these packages at all. And so at that particular point, he clearly indicated, I'm now waiving my Fifth Amendment right, and I'm stating on the record, I don't know anything about those packages. So he has no challenge or standing to challenge this search of the package. Kennedy. Counsel, there's been a lot of discussion here today, both sides leading off with it, on the — on the inspection of the package in California. If we were to conclude that there was a Fourth Amendment violation, that there was meaningful interference, and conclude that evidence should have been suppressed, where are we? We're in really bad shape. Well, you may be. Right. But where's the Court? What do we do? Well, in this particular case, the only evidence, again, is the fact that the defendant was put on the stand. If that evidence from California was seized, or those packages, excuse me, were suppressed, then, of course, the only thing the government has at that point is the search warrants that were conducted in California. Based on that investigation, it's that part of the conspiracy where they did find envelopes from Mississippi using the same aliases found in the residences attributable to Jones. They found the cash money. They found mailing labels with YMI, Incorporated, which were the same sender addresses for the drugs that were transported to Mississippi, money counting machines, vacuum seal wrappers, all of the paraphernalia for drug distribution. Where did they find the $400,000, remind me? That was in one of the residences attributable to Jones. As the evidence showed, his vehicle was actually registered when they ran that as part of their investigation to a Copies Plus, which is basically another one of these mailbox handling services, which again is based on the way drug traffickers typically try to hide assets and their identity by having it come back to a business. While in and of itself not illegal, it's just one more level that they used to hide. Additionally, they found the identification driver's license with his photo. Someone else's different name, and he tried to explain that away, put that off on a supposedly sketchy roommate who may have created that, which allowed him to... With his signature on that license. Correct, and admitted that that was his photo and looked like his signature. Was the money, the $400,000, was sealed in the seal, the seal meal stuff? No, Your Honor. The drugs were sealed in the heat seal. The money was actually found banded together in envelopes that were opened in the residence. Like I said, it was definitely classic drug trafficking where he had 10 kilograms there in California ready to be distributed, and then of course had $360,000 of cash, which they converted, the district court did, to cocaine, using a very conservative amount of like $14,000 a kilo. As we even briefed, if we used $20,000 a kilogram, it would still put it well above the 50 kilograms necessary to sustain a conviction. Barring any further questions, since time is about out, the government will rest on its brief. Thank you. Thanks. Thank you again, Your Honors. Well, I understand your quandary about the reasonable suspicion at the initial seizure. I would just say that the Daniels case does provide language that could be interpreted either way. When is the seizure, when is meaningful interference happened with the mail? And I would say in this instance, it clearly happened before the warrants were issued. Now, with respect to the 404B evidence, first of all, the prosecution talks a lot about the California evidence. Indeed, there was a lot of cocaine and money found in California. There's never any tying together of whether or not any of those drugs found in California were being mailed to or sent to Mississippi for delivery to any of these other charged co-conspirators. It's just simply a fact. There's never no evidence whatsoever presented about it. I thought the whole Jones entry into the post office, that's all going to Mississippi from California. Well, simply because the situs of — in other words, if there's a conspiracy, I would counter that with a hypothetical. If you have a conspiracy in California to sell drugs or to distribute drugs in other California to a different State, that that's part of the conspiracy with those individuals, it's just — you can't just mix the States together and say there's a conspiracy. There's no — I'm not sure why not, if it charges, but anyway, you've got to ask for a multiple conspiracy instruction. I understand what you're saying, Your Honor. However, in this particular instance, I have not found one on the record, okay? But in this instance, also, counsel had no idea why any of this evidence was being admitted until after the trial was over, after the jury returned its verdict. How — No idea. How would you — how could you? Because the court did not rule on it expressly. And in the second — He knew why it was tied, but that was the basis of his motion to suppress or keep it out. I mean, he clearly understood — Well, he was only — the motion to suppress was only dealing with the drugs that were mailed, that were seized from the mail in the post office in California. The motion to suppress had nothing to do with the — I don't think in this record prior counsel ever says, Judge, we need you to rule now. I think — but I'm not sure. I don't know the record myself. I thought the defense attorney was agreeing, listen, it'll get clearer when you hear from more people. But there's a — Okay. So the timing issue isn't big. The timing — the counsel had no choice but to acquiesce to the court's decision on how it was going to conduct the trial. And in that instance, you know — and the judge even says counsel does not have to stand up and make an objection every time this evidence comes in. I don't want that to happen. At the suppression hearing three or four days before the trial started, I think, or the date, something like that, the court says, I'll take this up at trial. And so at least at the opening of trial, I don't know if Judge Bramlett had anything raised with him then. We're starting trial now. Let's get a ruling on suppression. I don't think that happened, did it? Okay. And so you just had the continuing objection or wherever else you want to deal with it. So I'm not sure Judge Bramlett, in his ruling on the 23rd, if I recall the dates right, and trial starting on the 27th, said wait until the end of the trial. He said on the 23rd, I will rule on this trial. And so it does seem to me there's some obligation on the part of defense to say, Your Honor, it's time. I understand. However, the objection that I'm talking about happened after the motions were filed by counsel. I thought they called the first one. Then Judge Bramlett said we're going to take up your motions. That's one of the times that the judge did talk about when he was going to bring up the motions. However, there's an order prior to trial that states we're going to deal with these motions on the start of trial. Didn't happen that morning. And during the voir dire, there is a statement made from counsel and from the court. I don't have the numbers in front of me, but I'm glad to send from the ROA in front of me where his quote is. But the judge is very explicit in stating that a continuing objection has been lodged to the admission of all this evidence, including the search warrants, the search California evidence, the lay fair evidence, and the suppression motion as well. All of these were deferred, and the judge said you do not have to stand up and make an objection every time this evidence comes in. And so counsel was handicapped to that regard. So you heard me pressing the government with my line of questioning about did the government, in closing argument, argue that evidence could be considered guilt-in-chief that the district court had said it couldn't be. That's what I was asking him about. Absolutely. But in your reply brief, you disclaimed that as reversible error. You specifically say the court failed to instruct the jury that the California evidence was admitted under 404B. So if your statement is right, you are not arguing that the government varied from what the court had said was the crime charge. Your error is that the court didn't instruct it as to California. Well, there's alternative ways of arguing this, depending on the issue. So what we have here, and I know my time is up, but I will simply state for final presentation here, that this evidence was brought in, it shouldn't have been brought in, and Mr. Jones' right to a fair trial was violated as a result of it. The government relied upon this as intrinsic to the conspiracy. It's not charged, and it was the court specifically stated after trial that it was 404B evidence. With that, we would ask you to please reverse the conviction, Mr. Jones. And I thank you very much, Your Honors. Thank you very much. Counsel.